IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| Richard Allen Griffith,<br><br>           Plaintiff,<br><br>      vs.<br><br>Commissioner of Social Security,<br><br>           Defendant. | CASE NO. 1:23-cv-618<br><br>**DISTRICT JUDGE**<br>Christopher A. Boyko<br><br>**MAGISTRATE JUDGE**<br>James E. Grimes Jr.<br><br>**REPORT &**<br>**RECOMMENDATION** |

Plaintiff Richard Allen Griffith filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the Court affirm the Commissioner's decision.

**Procedural background**

In September 2020, Griffith filed an application for disability insurance benefits alleging a disability onset date of July 10, 2020,[1] claiming that he was disabled due to social phobia, avoidant personality disorder, demophobia,

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

agoraphobia, claustrophobia, knee and ankle issues, eye issues, depression, "possible autism," and issues with his hands. *See* Tr. 250; 254. The Commissioner denied Griffith's applications at the initial level and upon reconsideration. Tr. 65–72; 74–81.

In September 2021, an Administrative Law Judge (ALJ) held a hearing at which Griffith and a vocational expert testified. Tr. 28–63. The ALJ issued a written decision in December 2021 finding that Griffith was not disabled. Tr. 10–27. The ALJ's decision became final in January 2023, when the Appeals Council declined further review. Tr. 1–6; *see* 20 C.F.R. § 404.981.

Griffith filed this action in March 2023. Doc. 1. In it, he asserts the following assignment of error:

> 1. The ALJ failed to identify substantial evidence supporting the RFC finding, the ALJ failed to evaluate the medical opinions pursuant to the regulations, the hypothetical question presented to the vocational expert did not constitute substantial evidence, the resulting step 4 finding is unsupported by substantial evidence.

Doc. 9, at 1.

**Factual background**

*1.  Personal and vocational evidence*

Griffith was born in July 1959, and was 61 years old on the alleged disability onset date. Tr. 250. According to the agency, Griffith's last insured date will be December 31, 2024.[2] Tr. 64. Griffith has a college degree and past

[2]      To be entitled to Disability Insurance Benefits, a claimant must be a wage-earner who accumulated sufficient earning credits and became disabled

2

relevant work as a clinical analyst and an electronic medical record analyst. *See* Tr. 36; 242; 255. He was terminated from his job as an electronic medical record analyst on July 10, 2020, the alleged disability onset date. *See* Tr. 250; 457.

### 2.   *Medical and evidence*[3]

Griffith established care at Community Counseling Services with Kelly E. Geyer, APRN-CNP,[4] to address anger issues and depression. *See* Tr. 459–60. He saw Geyer once a month for four months then discontinued treatment with her. *See* Tr. 442–44; 447–50; 452–56; 457–59.

Geyer conducted an initial psychiatric evaluation in July 2020. Tr. 457–61. Griffith reported "mood swings, irritability, and sleepiness due to financial stress and uncertainty." Tr. 458. He was overly sensitive to touch and smell. *Id*. When Griffith felt upset, he became "verbally angry." *See* Tr. 458. He did not like going out or being in social settings and preferred to stay at home where things were arranged as he liked. Tr. 458.

---

before the end of his or her insured date. *See, e.g.*, 42 U.S.C. § 423(c)(1); *see also Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988); *Soc. Sec. Disab. Claims Prac. & Proc.* § 5:3 (2nd ed. 2022).

[3]    This recitation of medical evidence is not intended to be exhaustive. As the Commissioner points out, Griffith's challenges focus on the evaluation of mental impairments. Doc. 11, at 3 n.1. The discussion of the evidence is limited to that matters relevant to that evaluation.

[4]    APRN is an abbreviation for Advanced Practice Registered Nurse. *Advanced Practice Registered Nurse (APRN)*, OhioAPRN.com, http://www.ohioaprn.com/what-is-an-aprn-.html [https://perma.cc/69UR-XX65]. CNP is an abbreviation for Certified Nurse Practitioner. *Id*.

Griffith's wife, Mary, attended the evaluation and reported that Griffith had "frequent outbursts of anger, depression, and anxiety." Tr. 458. She speculated that Griffith might have autism spectrum disorder. Tr. 457. Geyer informed Mary that she wouldn't be able to evaluate Griffith for autism but could help with his anxiety and depression. Tr. 458. Mary told Geyer about an incident where Griffith pushed her, knocked her down, and caused her to strike her head. Tr. 457. Mary sustained a bleeding head wound and Griffith was arrested. *Id*.

Griffith also discussed what happened with Mary. Tr. 457. He said that she struck him so he "pushed her away from him" at which point she fell and hit her head. *Id*. He said that "nothing like that had ever happened before" and that he and Mary were in marriage counseling. *Id*. Griffith said that he attended court-mandated counseling as part of a diversion program and that successful completion of the program would lead to the dismissal of domestic violence charges that resulted from the incident. *Id*.

According to Griffith, the incident with Mary led to his termination from Avita, the healthcare company where he had worked as an electronic medical record analyst for more than three years. *See* Tr. 250; 255; 457. Griffith explained that he had worked primarily with women at Avita. *See* Tr. 457. He said that he was fired after the arrest on domestic violence charges because his female colleagues no longer wanted to work with him. *See id*.

4

Griffith reported previous, unsuccessful attempts to address mental health issues through the use of Ambien, Wellbutrin, Prozac, Lexapro, and Buspar. Tr. 458. Geyer diagnosed Griffith with "major depressive disorder, recurrent unspecified" and prescribed Zoloft. Tr. 445, 458.

In August, Griffith had a telehealth follow-up with Geyer. Tr. 442–46. Griffith's speech, thought process, thought content, perception, affect, and cognition were normal. Tr. 443. He had good insight and judgment, his speech was clear, and he spoke at a normal rate and rhythm. Tr. 443–44. Geyer found that Griffith was appreciative, agreeable, cooperative, alert, oriented, and attentive with a euthymic mood[5] and normal affect. *Id*. Griffith reported feeling no different since starting Zoloft. Tr. 442. Geyer discontinued Zoloft and prescribed Vilbryd instead. Tr. 444.

In September, Griffith had an in-person follow-up with Geyer. Tr. 447–51. Griffith's speech, thought process, thought content, perception, affect, cognition, and gait were normal. Tr. 448. He was cooperative with fair or good insight and judgment.[6] *Id*. His thought process was linear and logical, his mood was pleasant, and his responses were appropriate. Tr. 449. Griffith reported that about two weeks earlier, he switched antidepressants from Vilbryd to Pristiq and hadn't yet noticed any benefit. Tr. 447. Griffith described having

---

[5]    A euthymic mood is tranquil, neither depressed nor manic. *See* Dorland's Illustrated Medical Dictionary 647 (33rd ed. 2020).

[6]    Geyer checked boxes indicating that Griffith's "insight/judgment" was both good and fair. Tr. 448.

"grainy vision, a minor daily headache, and sleep disruption[,]" though he wasn't sure whether these problems were related. *Id*. Geyer suggested Griffith continue taking Pristiq for at least another week and advised him to take new medication for 30 days before assessing efficacy in the future. *Id*.

In October, Griffith had another in-person follow-up. Tr. 452–56. Geyer found that his speech, thought process, thought content, perception, affect, cognition, and gait were normal. Tr. 453. His mood was euthymic, he maintained good eye contact, and he had a linear and logical thought process. Tr. 454. Griffith reported that had stopped taking Pristiq and would not be returning for further psychiatric care. Tr. 452. He told Geyer that his mental health was "much better" than it had been before he started treatment. *Id*. He was in "a better place." Tr. 454. Once he stopped working, Griffith found that he was better able to control his depression and irritability. Tr. 452, 454. Geyer wished him well. *Id*.

Two months after discontinuing psychiatric treatment, Griffith saw his primary care provider, Jacob L. Kessler, APRN-CNP, for a routine visit. Tr. 411–18. Kessler observed that Griffith had no behavioral problems and no sleep disturbance. Tr. 415. He was not nervous or anxious. *Id*. Griffith was cooperative, alert, and well-oriented. Tr. 416. His appearance, attention, mood, behavior, thought content, and cognition were normal. *Id*.

6

### 3. *State agency and other medical opinion evidence*[7]

In January 2021, consultative clinical psychologist James C. Tanley, Ph.D., conducted a disability assessment. *See* Tr. 425–29. Griffith's chief complaints were high blood pressure and eczema. Tr. 425. Griffith reported not sleeping well. *Id*. He said that he had twice received treatment for depression. *See id*. The first time was ten years earlier and the second time was in 2020 when Griffith saw Geyer. *See id*; *see also* Tr. 442–59. Griffith denied having any behavioral or emotional difficulties, though he "expressed some sadness about the recent euthanasia of a pet." Tr. 428. Griffith reported dealing with job stress by walking away. *Id*. He said that he felt "some peace" without the stress of work. *Id*. As for being fired from Avita, Griffith said that he had been told he was being let go due to incompetence but believed it was because "the women there simply didn't like [him]." *Id*. Dr. Tanley asked why they didn't like him and Griffith "wasn't able" to explain. Tr. 428.

Dr. Tanley found that Griffith was generally cooperative with good eye contact and an "appropriate and demurring" affect. Tr. 427. He noted that

---

[7]    When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

Griffith had "never been psychiatrically hospitalized, [did] not currently see any mental health professionals on an outpatient basis for treatment, and [did] not take any psychoactive medication." Tr. 428. Dr. Tanley found that Griffith had no mental limitations. Tr. 429.

Specifically, Dr. Tanley found that Griffith had no difficulty in understanding, remembering, and carrying out instructions. *Id*. He estimated that Griffith's verbal intellectual functioning was "at least average," which an employer "would expect … in a work setting." *Id*. Dr. Tanley opined that Griffith's attention and concentration, persistence, and ability to maintain pace were unimpaired. Tr. 29. Dr. Tanley noted that Griffith "responded appropriately and in timely fashion to all examiner questions." *Id*. Dr. Tanley found that Griffith should have "little or no difficulty with tasks of increasing complexity" and with tasks that involved multiple steps. *Id*. Dr. Tanley opined that he didn't expect Griffith to have difficulties in responding appropriately to work pressures in a work setting and noted that Griffith's reported work history lacked evidence of "mental or emotional deterioration in response to work exposure." *Id*. As to the ability to respond appropriately to supervision and coworkers, Dr. Tanley opined that Griffith had "behaved in a rather demurring fashion" throughout the evaluation. Tr. 429. Griffith told Dr. Tanley that he tried to get along with everybody. *Id*. Dr. Tanley indicated that the only problem with other people that Griffith reported was that "for some reason,"

8

the women at his most recent job "did not like him." *Id*. Dr. Tanley found that Griffith should have "little or no difficulty in this domain." *Id*.

In January 2021, initial state agency consulting psychologist Paul Tangeman, Ph.D., reviewed the medical evidence. Tr. 65–72. He found that Griffith had no medically determinable psychological impairments. Tr. 67. In April 2021, state agency consulting psychologist Cindy Mayti, Ph.D., reviewed the evidence during reconsideration also found that Griffith had no medically determinable psychological impairments. Tr. 76.

In September 2021, licensed professional clinical counselor Trevor Simmons conducted a psychological evaluation. *See* Tr. 461–70. Griffith reported that he was happily married. Tr. 462. He said that he did not have any friends with whom he engaged and that he was "typically happier at home … with [his] hobbies on his own." *Id*. Griffith indicated that he wanted insight into his social deficits—a tendency to isolate, difficulty socializing, trouble communicating with others—which he said made it hard for him to obtain and maintain employment. Tr. 461. Simmons found that Griffith could hold a conversation and build on the topic of discussion. Tr. 461. Griffith's speech, rhythm, and flow were typical if "slightly monotone." *Id*. Simmons noted that Griffith maintained a pleasant and inviting demeanor throughout the assessment. Tr. 462. He was open to engage with Simmons in conversation, provide insight, and elaborate about behaviors, symptoms, and concerns. *Id*.

Griffith's thought process was logical. *Id*. He had appropriate eye contact but at times, he diverted his eyes and avoided contact. *Id*.

Simmons administered multiple tests including a Social Communication Questionnaire, Autism Diagnostic Observation Schedule, Social Responsiveness Scale, Adaptive Behavior Assessment System, Conner's Adult ADHD Rating Scale, and Personality Assessment Inventory. Tr. 463–69. He noted that Griffith was able to ask appropriate questions to gain further insight or clarify what Simmons meant in his questions. Tr. 463. Simmons found that Griffith was "engaged throughout the testing process and completed all tests thoroughly." Tr. 463. He determined that Griffith did not have any symptoms associated with autism spectrum disorder. Tr. 464. Griffith's "Self-Report [Social Responsiveness Scale-Second Edition] Results" rating suggested "significant impairment and deficiencies in reciprocal social behaviors that [were] clinically significant and lead to severe and enduring interference with everyday social interactions." Tr. 465. Griffith had average adaptive functioning skills across three domains and nine subdomains with relative weakness in the communication subdomain and the social domain and subdomain. Tr. 465–6. Simmons determined that although Griffith had "some social communication abnormalities," he didn't meet the criteria for Autism Spectrum Disorder. Tr. 469. Simmons diagnosed "Social (Pragmatic) Communication Disorder" including "persistent difficulties in the social use of verbal and nonverbal communication." Tr. 470.

### 4. Function and Disability Reports

In September 2020, Griffith completed a Disability Report. Tr. 253–66. He claimed that his ability to work was limited by impairments including social phobia, demophobia, agoraphobia, claustrophobia, avoidant personality disorder, depression, and "possible autism." Tr. 254. Griffith said that he stopped working on July 10, 2020, for reasons other than his impairments, namely, that he had been "wrongfully fired." *Id*. Griffith's last day at Avita, July 10, 2020, was the date that he alleged as his disability onset date. Tr. 250; 457. Griffith said that, also on July 10, 2020, his conditions "bec[a]me severe enough to keep [him] from working." *See* Tr. 250, 254. Griffith admitted he had made no changes in his work activity—*e.g.*, duties, working hours, pay— due to his impairments. Tr. 254.

In October 2020, Griffith completed a Function Report. Tr. 276–83. The report asked him to describe how his illnesses, injuries, or conditions limited his ability to work. Tr. 276. Griffith said that difficulty getting along with others and misreading social cues irritated his colleagues and led them to have a "lack of respect" for him. *See id*. Griffith said he wasn't promoted regardless of merit. *Id*. He said that he avoided social interactions, which made him feel "anxiety, fear, a need to flee, and discomfort." *Id*. "[H]e fear[ed] crowds." *Id*. Griffith felt "panic[ked], helpless, [and] embarrass[ed]" like he needed to leave but couldn't escape. *Id*. He said that constant worry, racing thoughts, and depression further limited his ability to work. *Id*.

11

Griffith indicated that he went shopping for groceries about every two to three weeks and bought items by phone, through curbside pick-up, or through in-store shopping. Tr. 279. He was able to pay bills, count change, handle a savings account, and use a checkbook or money order. *Id*. His ability to manage money hadn't changed due to his impairments. *Id*

Griffith said he had problems getting along with family, friends, neighbors, and others. Tr. 280. After he was fired from Avita, Griffith found that the resulting reduced social interaction "brought more peace into [his] life." *Id*. He "yelled at his wife and mother" less frequently. *Id*. Griffith indicated that he had been fired or laid off because of problems getting along with people. Tr. 281. He explained that "they did not like [him] and [he] could not please them. Why? [He] d[id]n't know[.] … [If he did, he] would have corrected the situation." *Id*. He said that the circumstances of his firing from Avita proved that he was unable to work. Tr. 280–81.

### 5. *Testimonial evidence*

Griffith and a vocational expert testified during the hearing in September 2021. Tr. 28–63. Griffith was represented by attorney David Dick, who submitted a pre-hearing brief advocating that the ALJ find Griffith disabled. Tr. 315–18.

Griffith testified about his most recent work as an electronic medical record analyst at Avita. Tr. 36. In that role, Griffith was responsible for assisting physicians' offices with software updates and other troubleshooting

related to their electronic medical records. Tr. 36–37. Griffith was generally seated as he performed this job and, at most, lifted the weight of "a pad and paper." Tr. 37. Before Avita, Griffith performed a similar job for twelve years at Ohio Health. Tr. 37–39; 255. He was fired from Avita in July 2020. Tr. 41; 250.

Griffith testified that throughout his life he had experienced difficulty getting along with people. Tr. 51–52 ("I don't know what it is about them not understanding me and me not understanding them, but it doesn't work."). He did "much better by [him]self." Tr. 52. He indicated that had been fired from Avita because he was unable to perform the job duties and didn't get along with others. Tr. 49. Griffith explained that his colleagues "didn't like [him]" so "[he] didn't like them." *Id*. Memory and concentration weren't his problem—he was "pretty good on that"—but rather the fact that he "sometimes misinterpreted things" caused problems with his coworkers. *Id*.

Griffith said that he had lived with his wife for 23 years. Tr. 42. In November 2020, Griffith's mother moved in with Griffith and his wife. *Id*. Griffith enjoyed watching television, playing chess and solitaire on his phone, and reading all kinds of books. Tr. 44. Crowds made him anxious and made his thoughts race. Tr. 52. He didn't have a "whole lot to do normally, other than a lot of phone calls." Tr. 44. He liked to spend time swinging on his front porch swing before going to bed. *Id*.

13

After Griffith, vocational expert Michael Klein testified. Tr. 53–61. Klein classified Griffith's past work as sedentary and skilled. Tr. 58. He testified that a hypothetical individual with the same age, education, and work experience as Griffith, with the limitations assessed in Griffith's residual functional capacity (RFC)[8], described below, could perform Griffith's past work. Tr. 55–56. Using a cane would still allow such an individual to perform sedentary labor such as Griffith's past work. Tr. 56. The ALJ and Klein had the following exchange with respect to social interaction:

> [ALJ]:      Okay. For the next hypothetical if we look at the first two hypotheticals and we added in this individual can understand, remember, carry out work tasks, make judgments on work tasks, this individual can respond appropriately to usual work situations, and handle occasional changes in the work settings in tasks, this individual can have occassional interaction with the general public, would that change your answer for the first two hyootheticals?
>
> [Klein]:      The only question I had was occasional contact with the general public. The job requires more than occasional contact with the people he is working with in the work site. If you are including that I don't believe the [past relevant work] could be performed.
>
> [ALJ]:      If it would be more than occasional contact with coworkers that job could not be

---

[8]      An RFC is an "assessment of" a claimant's ability to work, taking his or his "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

performed but if it was just occasional with the general public would that impact the job?

[Klein]:        I don't believe so, no.

Tr. 56–57. Being absent more than once a month or off task more than ten percent of the workday would be work preclusive. Tr. 57.

### 6. *Vocational evidence*

Griffith had been an electronic medical record analyst at Avita for three and half years when he was placed on a personal improvement plan (the Plan). *See* Tr. 195–232, 280. The Plan, which was presented to Griffith in May 2020, Tr. 196, *see* Tr. 202, listed goals in several categories—prioritization, critical thinking and skills, confidentiality, accountability, respect for manager and team, customer service and respect—for improvement. Tr. 202. Griffith needed to be more accountable for his own work, take ownership of his work, and accept responsibility for his mistakes. Tr. 98. He needed to remain respectful of managers and co-workers, refrain from arguing with co-workers, and contribute to a "healthy, productive, and satisfying environment for … customers and [his] department." Tr. 198. Griffith needed to learn to identify urgent help desk calls as opposed to calls that he could address and resolve. Tr. 197. He was to try to look up information and handle help desk calls independently before contacting a manager and waiting for a response. Tr. 197; 199. Griffith needed to maintain the security and confidentiality of information about fellow employees and patients. Tr. 200. He was expected to contribute to a culture of customer service and respect in which all people felt "appreciated,

15

included, and valued." Tr. 201. Over seven weeks in May and June 2020, Avita manager Jennifer Taylor observed Griffith at work and met with him weekly to review his progress. *See* Tr. 195–232.

On July 8, 2020, eight weeks after Griffith received the Plan, Taylor issued a summary recommending termination.[9] *See* Tr. 202–04. She said Griffith's work performance had improved little during the Plan observation process. Tr. 202. She indicated that Griffith could help customers as long as he had "complete guidance on how to manage issues and [was] told step-by-step how to manage help desk calls[,]" but that the "challenges manifested" if he was "[l]eft unguided." *Id.*

According to Taylor, Griffith had no issues with confidentiality during the Plan review period, however, he failed to meet expectations in the other areas of improvement. *See* Tr. 202–03. As to prioritization, Griffith hadn't improved and still remained unable to rank help desk calls based on his own assessment of the issues. Tr. 202. Taylor observed Griffith asking callers if they had an emergency. *Id.* Griffith's critical thinking skills were still a problem. *See id.* He referred a customer to the clinical staff about an administrative issue that Griffith could have resolved if he had attempted to understand. *Id.* Griffith's accountability hadn't improved. Tr. 203. Taylor watched as he made "no attempt … to be accountable" or "even help" customers. Tr. 203. Although

---

[9]     Taylor made her recommendation two days before Friday, July 10, 2020, Griffith's alleged disability onset date and the date on which he says he was fired. *See* Tr. 250; 457,

16

the "interpersonal skills between [Griffith] and [his] team [had] been strained for some time," Taylor didn't see any issues or interactions. *Id*. She said that Griffith "ke[pt] to himself" during the observation period. *Id*. Griffith's customer respect and service did not improve. *Id*. He relayed a manager's directive to a customer but did not understand the directive, which created an issue with the customer. *See* Tr. 203.

**The ALJ's decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.

2. The claimant has not engaged in substantial gainful activity since July 10, 2020, the alleged onset date (20 CFR 404.1571 et seq.).

3. The claimant has the following severe impairments: obesity, bilateral carpal tunnel syndrome, status post left carpal tunnel release; and bilateral knee osteoarthritis, status post left knee surgery (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except in that the claimant can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently. He can sit for 6 hours out of an 8-hour workday and can stand and/or walk for 2 hours

17

out of an 8-hour workday. He must be able to use a cane to assist in ambulation throughout the workday. The claimant can never climb ladders, ropes, or scaffolds and can occasionally climb ramps and stairs, balance, crouch, kneel, stoop, and crawl. With bilateral upper extremities, he can frequently handle, finger, and feel. With the bilateral lower extremities, he can occasionally push and/or pull or operate foot controls. He can have occasional concentrated exposure to extreme cold, heat, and humidity. He cannot work around unprotected heights, heavy machinery, or unprotected moving mechanical machinery. He cannot perform any commercial driving.

6. The claimant is capable of performing past relevant work as a User Support Analyst, DOT code 032.262-010 SVP 7, sedentary exertional level per the DOT and as performed by the claimant. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from July 10, 2020, through the date of this decision (20 CFR 404.1520(f)).

Tr. 13–23.

## Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a, 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 404.1520. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v.*

*Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

**Discussion**

*1.* *Evaluation of Simmons's report*

Griffith's starts his argument with a single caption, which contains four separate arguments. Doc. 9, at 13. From this unfocused start, things go downhill.

Over the next two pages, Griffith hints at possible arguments, provides context-free complaints about the ALJ's analysis, and provides caselaw that might have something to do with his claims. Doc. 9, at 13–15. He then moves to his first argument, which concerns Simmons's report.

According to Griffith, "[t]he ALJ erred at step 2 and when failing to consider the objective evidence contained in the report of Mr. Simmons," Doc. 9, at 15, who determined that Griffith met the criteria for Social (Pragmatic) Communication Disorder. Tr. 470. Indeed, Simmons spends several pages discussing the report and how the ALJ's failure to consider the report prejudiced him. *Id.* at 15–19. He even goes so far as to suggest that the ALJ "cherry-picked" his "findings," *id.* at 17, before asserting that the ALJ's "errors" as to Simmons's report "require remand," *id.* at 18.

The problem with this line of argument is that (1) "a physical or mental impairment must be established by objective medical evidence from an *acceptable medical source*," 20 C.F.R. § 404.1521 (emphasis added), and (2) the ALJ determined that Simmons, who was a Licensed Professional Clinical

Counselor, Tr. 470, was not an acceptable medical source, Tr. 16; *see* 20 C.F.R. § 404.1502(a) (defining *acceptable medical source*). And, since Simmons was the only healthcare provider who diagnosed or discussed social communication disorder, the ALJ determined that there was no objective medical evidence from an acceptable medical source in the record to establish the existence of the disorder. *See* Tr. 16; *see also* Tr. 461–70. Further, once the ALJ determined that social communication disorder was not a medically determinable impairment, she properly terminated her analysis at step two. *See* Tr. 16.

For his part, however, Griffith does not dispute the ALJ's determination that Simmons was not an acceptable medical source. *See* Doc. 12, at 1. In fact, he presents his argument as if that determination doesn't matter, asserting that "[r]egardless as to … whether the report of Mr. Simmons constituted an opinion from an acceptable medical source the evidence indicates that [Griffith's] mental impairments caused limitations, and these limitations are supported by objective findings." Doc. 9, at 15–16. But that determination does matter; by regulation, it takes an acceptable medical source to establish a mental impairment.[10] 20 C.F.R. § 404.1521. And, contrary to Griffith's implicit suggestion, the comprehensiveness of a report does not change the Agency's

---

[10]     See *Holmes v. Kijakazi*, No. 1:20-cv-01317, 2022 WL 4132884, at *9 (N.D. Ohio Sept. 12, 2022) ("The distinction between 'acceptable medical sources' and other health care providers who are not 'acceptable medical sources' is necessary [in part because] we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment.") (citing *Johnson v. Comm'r of Soc. Sec.*, No. 1:17-cv-847, 2018 WL 3632226, at *5 (N.D. Ohio July 31, 2018)).

rules and regulations, which distinguish acceptable medical sources from other sources. *See* 20 C.F.R. § 404.1502(a).

As Respondent argues, Griffith's argument amounts to an invitation to ignore the controlling regulations. Doc. 11, at 8–9. But Griffith has offered no argument that the regulations are invalid or do not apply. So there is no reason to ignore them. Griffith's argument about Simmons's report is thus nearly irrelevant.

In his reply, Griffith presents a new argument, that the "test results and" Simmons's report constitute objective evidence which "contradicts the ALJ's step 3 finding, RFC finding, and the discounting of Plaintiff's allegations." Doc. 12, at 1. He says that the ALJ was required to consider the "objective evidence within … Simmons's report." Id. at 2. But Griffith never argued in his opening brief that the ALJ's alleged error in regard to Simmons's report had anything to do with the third step in the sequential analysis. He also never argued, as he does in his reply, that the test results and Simmons's report constitute *objective medical evidence* because—despite not being from an *acceptable medical source*—they are *signs*, as that term is defined at 20 C.F.R. § 404.1502(g). *See* 20 C.F.R. § 404.1502(f). So these new arguments are forfeited.[11] *See J. B-K. by E.B. v. Sec'y of Kentucky Cabinet for Health & Fam. Servs.*, 48 F.4th 721, 730 (6th Cir. 2022).

---

[11]    Griffith provides no rule, regulation, or precedent showing that information in a report from a non-*acceptable medical source* can constitute *objective medical evidence*. Particularly because Griffith denied the

In the context of his argument about Simmons's report, Griffith argues that the ALJ "cherry-picked evidence that did not support [her] determination" regarding social communication disorder. *See* Doc. 9, at 16–17. Griffith argues that it is "simply inaccurate [for the ALJ to say] that the record lack[ed] objective medical evidence" of Griffith's social communication disorder. *See* Doc. 9, at 16. He claims that the ALJ cherry-picked the evidence, disregarding the "multiple objective diagnostic measures" that Simmons applied. *See id*. Griffith says that "a portion of the test results" from Simmons's "diagnostic measures" showed normal results in many areas and did not support a diagnosis of autism spectrum disorder, but that there were some results "consistent with greater than no limitations" that the ALJ ignored. *Id* at 17. Griffith then recites specific findings such as occasionally avoidant eye contact and difficulties with social behavior and interaction. *See id*.

Griffith's cherry-picking argument is a non-starter. The Sixth Circuit has observed that what one might argue is "cherry-picking," might "be described more neutrally as weighing the evidence." *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009). That Court has further noted that cherry-picking arguments are "seldom successful" because "crediting [them] would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014) (internal citation omitted).

---

Commissioner an opportunity to respond to his argument, I am disinclined to indulge Griffith's counterintuitive argument.

The ALJ here did not selectively choose facts in support of her decision but rather, found that the record did not contain any laboratory findings, clinical findings, or medical observations from an acceptable medical source to validate Griffith's symptoms and establish the existence of the disorder. *See* Tr. 16 (citing Tr. 470); 20 C.F.R. § 416.921; *see also Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 652 (6th Cir. 2009) ("At step two, an ALJ must evaluate the claimant's 'symptoms, signs, and laboratory findings' to determine whether the claimant has a 'medically determinable mental impairment.'") (quoting 20 C.F.R. § 404.1520a(b)(1)). Particularly given Griffith's failure to challenge the determination that Simmons was not an acceptable medical source, this aspect of the ALJ's decision was not erroneous.[12]

So the ALJ did not "cherry pick" the record in assessing social communication disorder, and she applied the appropriate caselaw, regulations, and rulings. *See* Tr. 16–17. It is undisputed that a licensed professional clinical counselor is not an acceptable medical source and thus Simmons' diagnosis and findings don't support finding a medically determinable impairment. As such, the ALJ did not err in finding that social communication disorder could not be medically determined and declining to consider its severity. Griffith may not

---

[12]     Griffith says that "the ALJ failed to acknowledge that an acceptable medical source, Kelly E. Geyer, APRN-CNP of Community Counseling Services assessed Plaintiff for major depressive disorder." Doc. 9, at 16. But he doesn't develop an argument about this alleged error, so he's forfeited it. *See Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022).

agree with the ALJ, but disagreement does not "provide a basis for remand." *Steed v. Colvin*, No. 4:15-cv-1269, 2016 WL 4479485, at *10 (N.D. Ohio Aug. 25, 2016).

2. *The evaluation of testimonial evidence*

Griffith *seems* to argue that the ALJ erred in considering his testimony as to his mental impairments and employment history. I use the word *seems* because the subheading for the argument in his section of Griffith's brief is merely "Plaintiff's testimony and allegations." Doc. 9, at 19. And from there, Griffith engages in a hide-the-ball manner of argumentation that makes it frustratingly difficult to determine the exact nature of his complaint and what, if anything, in the record supports it. For instance, Griffith acknowledges that the ALJ relied in part on Griffith's statements in assessing mental function but he doesn't cite the decision when he says that the ALJ did not credit Griffith's testimony regarding the circumstances under which Avita terminated his employment. *See* Doc. 9, at 19–20. Griffith also says—again, without citation—that even though Griffith's testimony as to difficulty with social interaction at work was "corroborated by the employment record and treatment records[,]" the ALJ "failed to make this comparison." *See* Doc. 9, at 20.

And then there's question of how the ALJ's alleged error affected the decision. Griffith says that "the medical record corroborates allegations that his mental functioning was worse when working." Doc. 9, at 21. He then points

to evidence about his poor job performance and says, "that the ALJ did not discuss the employment records anywhere in the decision." *Id*. Griffith concludes that "[t]he consistency of the evidence was not acknowledged by the ALJ, and the lack of analysis prevents meaningful judicial review." *Id*.

Based on this presentation, one is left to guess what part of the ALJ's decision is at issue. At best, it appears that Griffith, who is represented by counsel, is arguing that the ALJ should have found that Griffith's "mental functioning was worse when working." Doc. 9, at 21. How such a finding would matter is a mystery for which Griffith does not supply answer.

Nonetheless, the ALJ, in fact, acknowledged Griffith's reports of difficulty in several functional areas. *See*, *e.g.*, Tr. 17. For example, she considered Griffith's statements that he "prefers to be at home, he has difficulty being in crowds and that he had issues interacting with coworkers" in determining that he had a mild limitation in interacting with others. Tr. 17 (citing Hearing Testimony). The ALJ credited Griffith's testimony that he "prefers to stay at home and … becomes anxious in crowds" as she concluded that he had a mild limitation in adapting or managing himself. *Id* (citing Hearing Testimony). The ALJ considered testimonial evidence about Griffith's social phobias as contained in his Function Report. *See* Tr. 19. She noted that

> He reported having difficulty getting along with co-workers and that he mis-reads social cues. He stated that he experiences anxiety[,] fear and a need to escape. The claimant stated that he avoids social situations and crowds and that he feels panic. He

27

> indicated that he is unable to shut off his thoughts and that he experiences depression.

(citing Tr. 276–83). In support of her findings, the ALJ also cited portions of the testimony. *See, e.g.*, Tr. 17. The ALJ noted Griffith's reporting that:

> his memory [was] good and that he [was] able to follow instructions[,] … that he enjoy[ed] playing chess[,] watching television[,] and reading and that his memory and concentration [we]re 'pretty good[,]' … that he manage[s] his personal finances[,] … [and] that he [was] able to drive and shop in stores and online.

Tr. 17 (citing Tr. 279–80; Hearing Testimony).

Griffith's argument would necessarily have this Court reassess the ALJ's evaluation of Griffith's testimonial evidence. *See* Doc. 9, at 14 ("The ALJ did not address the evidence from … Plaintiff's testimony … when finding Plaintiff had no mental limitations."); *see also* Doc. 9, at 19. But "[a]s long as the ALJ cited substantial, legitimate evidence to support his factual conclusions" a court conducting review of an ALJ's decision is "not to second-guess." *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). Here, the ALJ's determination that Griffith had no more than a mild limitation in interacting with others was supported by substantial evidence and "reversal would not be warranted even if substantial evidence supported the opposite conclusion." *Id* (citing *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir.2007). So the ALJ did not err in evaluating Griffith's testimonial evidence.

### 3. *The evaluation of Dr. Tanley's medical opinions*

In his third argument, Griffith continues his hide-the-ball presentation. He asserts that "[t]he ALJ failed to follow the regulations when evaluating the opinion of Dr. Tanley." Doc. 9, at 22. Griffith notes that the ALJ found Dr. Tanley's opinion "persuasive as it is consistent with the record as a whole." Noting that the ALJ is required to evaluate "the supportability and consistency" of a medical source's opinion, *see* 20 C.F.R. § 404.1520c(c), he says the ALJ failed to discuss the record as a whole. Doc. 9, at 22–23. Griffith also says that the ALJ's discussion of the consistency factor was inadequate. *Id.*

Oddly enough, Griffith doesn't claim that the ALJ should have found Dr. Tanley's opinion unpersuasive. He also doesn't claim that the error he alleges had any effect on the outcome of his case. Further Griffith does not argue for remand based on the ALJ's alleged error, instead, merely concluding that "the ALJ failed to follow the regulations." Doc. 9, at 23. And these omissions are odd because the Sixth Circuit has held that "if an agency has failed to adhere to its own procedures," the Sixth Circuit "will not remand for further administrative proceedings unless 'the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.'"[13] *Rabbers v.*

---

[13]     Griffith's claim thus bears some similarity to a plaintiff who asserts a due process violation—in absence of the violation of an underlying protectible interest—based a government's failure to follow a procedure. Because "[p]rocess is not an end in itself," but instead serves "to protect a substantive interest to which the individual has a legitimate claim of entitlement," that sort of claim fails. *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983).

*Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654–55 (6th Cir. 2009) (quoting *Connor v. United States Civil Serv. Comm'n*, 721 F.2d 1054, 1056 (6th Cir. 1983) and citing *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970) for the proposition that an "agency's failure to follow its own regulations did not require reversal absent a showing of substantial prejudice by the affected party").

Nonetheless, as to the substance, psychological consultative examiner James C. Tanley, Ph.D, conducted a disability assessment in January 2021. Tr. 424–29. He observed that Griffith had an appropriate affect and good eye contact. Tr. 427. He detected "no indication of inability to self-identify or to self-report mental difficulties." Tr. 428. Griffith denied having any behavioral or emotional difficulties, had "never been psychiatrically hospitalized, [did] not currently see any mental health professionals on an outpatient basis for treatment, and [did] not take any psychoactive medication." Tr. 428. Dr. Tanley found that Griffith had no mental impairment limitations. Tr. 429.

More precisely, Dr. Tanley found that Griffith had no difficulty in understanding, remembering, and carrying out instructions. Tr. 428. He estimated that Griffith's had "at least average" verbal intellectual functioning, which would meet employer expectations. *Id*. Dr. Tanley found unimpaired Griffith's attention and concentration, persistence, and ability to maintain pace. Tr. 29. He noted that Griffith was able to respond appropriately and timely during the evaluation. *Id*.

Dr. Tanley opined that Griffith should have "little or no difficulty with tasks of increasing complexity" and with tasks involving multiple steps. *Id*. He said that he didn't expect Griffith would have difficulties in responding appropriately to work pressures and noted Griffith's lack of any history of "mental or emotional deterioration in response to work exposure." *Id*.

Regarding the ability to respond appropriately to supervision and coworkers, Dr. Tanley noted Griffith's "rather demurring" behavior during the evaluation and his statement that he tried to get along with everybody. Tr. 429. Dr. Tanley found that Griffith should have "little or no difficulty in this domain" and noted that the only problem with others that Griffith reported was that the women in his last job didn't like him and he didn't know why. *Id*.

In her decision, the ALJ found Dr. Tanley's medical opinion persuasive and "consistent with the record as a whole." Tr. 21 (citing Tr. 424–30). The ALJ recited Dr. Tanley's findings as to the four broad areas of mental function and adopted his assessments in crafting the RFC without mental impairment limitations. *See id*. As noted, Griffith challenges the ALJ's assessment of Dr. Tanley's opinions on the grounds that the ALJ cited "but did not discuss the record as a whole[,]" omitted "key pieces of evidence … from the decision[,]" and insufficiently addressed the factor of consistency. *See* Doc. 9, at 23.

The Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, extent, and

examining relationship; specialization; and other factors. 20 C.F.R. § 416.920c(a), (c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id*. "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

The ALJ found that Dr. Tanley's opinion was persuasive and, as Griffith cites, noted its consistency with the record as a whole. Tr. 22. The ALJ then recited Dr. Tanley's opinions and found that they were supported by "other objective findings in the record." Tr. 22. The ALJ clarified that, "more specifically," she found that Griffith's "mood, affect, memory, behavior and thought content were *regularly* noted to be normal" and that he was "cooperative, alert and fully oriented." *See* Tr. (citing Tr. 416) (Kessler's observations of Griffith). Griffith's argument ignores the rest of the ALJ's decision and focuses solely on the paragraph containing the ALJ's findings. He

argues, essentially, that any analysis not articulated there isn't articulated at all. *See id.*

As an initial matter, as the Commissioner points out, Kessler's findings, including that Griffith was "cooperative, alert and fully oriented," are the only other relevant treatment notes besides Geyer's notes that discuss Griffith's mental health impairments.

Secondly, the ALJ's language indicates that she intended her citation to represent merely one example of "regularly noted" findings of Griffith's mental function. The record supports her finding with similar "normal" findings as those cited by the ALJ from treatment providers and consultative examiners and acknowledged by Griffith himself. *See, e.g.*, Tr. 67; 76; 254; 279–80; 415–16; 442–44; 447–50; 452–56; 457–59; 462–64; 466; 470. The ALJ cited such evidence elsewhere in her decision. *See, e.g.*, Tr. 17 (citing Tr. 276–83; Hearing Testimony); Tr. 19 (citing Tr. 253–66; 276, 278–79); Tr. 20 (citing Tr. 442–60; 452; Hearing Testimony); Tr. 21 (citing 461–62); Tr. 22 (citing Tr. 65–72; 74–81).Maybe the ALJ could have been more explicit. But, nonetheless, her finding is supported by substantial evidence. It isn't true that the ALJ's consideration of the consistency of Dr. Tanley's findings as compared to the record as a whole was limited to one paragraph and one citation. When the decision is considered in full, *see Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2020) ("[The court] read[s] the ALJ's decision as a whole and with common

sense."), it is evident that the ALJ adequately considered the factors of supportability[14] and consistency in finding Dr. Tanley's opinions persuasive.

Griffith next objects to the ALJ's evaluation of Dr. Tanley's opinions on the basis that the ALJ omitted "key pieces of evidence … from the decision" and indicates that those pieces of evidence were "noted above." Doc. 9, at 23. "Above," Griffith says that the ALJ cherry-picked evidence and ignored test results in Simmons's report. *See* Doc. 9, at 17. He also argues that the ALJ ignored evidence from the employment records. *See* Doc. 9, at 12. Griffith does not clarify which evidence he means. Griffith has forfeited this argument as undeveloped and perfunctory. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

Griffith's third objection to the evaluation of Dr. Tanley's opinions is that the ALJ's assessment of consistency was insufficient because she cited to just one treatment note. Doc. 9, at 23. As the Commissioner points out, outside of Geyer's findings, there was only one other treatment note relevant to mental impairments. *See* Doc. 11, at 15. And, as discussed, the ALJ cited evidence

---

[14] Although Griffith does not challenge the ALJ's consideration of the internal supportability of Dr. Tanley's findings, it is worth noting that the ALJ sufficiently addressed this factor as well, as the Commissioner points out. *See* Doc. 11, at 14; Tr. 17 (citing Tr. 427); Tr. 20 (citing Tr. 427); Tr. 21 (citing Tr. 428).

consistent with Dr. Tanley's opinion from "the record as a whole" elsewhere in her decision and, as such, sufficiently addressed the factor of consistency.

### 4. *The decision not to include mental impairment limitations in the RFC*

Griffith argues that "[t]he hypothetical question presented to the vocational expert did not reflect Plaintiff's physical and mental abilities, and step 4 finding are unsupported by substantial evidence." Doc. 9, at 23. Once again, however, Griffith hides the ball. He doesn't say what the ALJ should have included in her hypothetical.

Equally importantly, Griffith omits that the ALJ afforded his counsel the opportunity to question the vocational expert. *See* Tr. 59–65. And at the end of counsel's examination, counsel said, "Okay. That is all I needed to hear. Thank you." Tr. 61. Counsel voiced no objection to the question posed to the expert. He also didn't mention any issue during his closing argument, Tr. 61–62, or in the brief he filed on Griffith's behalf before the Appeals Council, Tr. 325–28. So this argument amounts to sandbagging, which the Court should not countenance. *See Garza v. Comm'r of Soc. Sec.*, No. 1:14-cv-1150, 2015 WL 8922011, at *6 (W.D. Mich. Nov. 25, 2015), *report and recommendation adopted*, 2015 WL 8958469 (W.D. Mich. Dec. 15, 2015); *see also Frederick v. Comm'r of Soc. Sec.*, No. 10-11349, 2011 WL 1518966, at *9 (E.D. Mich. Mar. 25, 2011) ("While counsel's failure object to the testimony at the hearing does not per se bar him from raising the issue here, the courts frown upon 'sandbagging' administrative decisions by presenting evidence or issues for the

first time upon judicial review which could have been raised before the ALJ."),
*report and recommendation adopted*, 2011 WL 1518913 (E.D. Mich. Apr. 20,
2011).

Putting this aside, during the hearing, the ALJ asked vocational expert
Michael Klein to consider a hypothetical individual who could perform
sedentary work. Tr. 55–56. The ALJ asked Klein to suppose that this
individual had physical limitations aligned with the RFC,[15] and, in accord with
the RFC, did not include any mental limitations. *See* Tr. 55.

Griffith says that this hypothetical did not "reflect Plaintiff's physical
and mental abilities" because it "did not include[] any mental limitations." *See*
Doc. 9, at 23–24. He recites a list of hypothetical conditions under which he
claims would have been found disabled including if he were limited to unskilled
or semiskilled work, required to interact more than occasionally with
coworkers, required more than typical breaks, would be off task more than ten
percent of the time, or would be absent more than one day per month. Doc. 9,
at 24 (citing Tr. 57). Griffith asserts that the employment records, testimonial

---

[15]    The ALJ asked Klein to consider an individual who would be limited to
lifting, carrying, pushing, and pulling 20 pounds occasionally and 10 pounds
frequently. Tr. 55. In an eight-hour day, this individual could sit for six hours
and stand or walk for two hours. *Id*. He or she could occasionally climb ramps
or stairs, but never ladders, ropes, or scaffolds. *Id*. The individual could
occasionally balance, crouch, kneel, stoop, and crawl, and operate foot controls.
*Id*. He or she could have occasional concentrated exposure to extreme cold,
heat, and humidity but could not work around unprotected heights, heavy
machinery,  or moving mechanical machinery. *Id*. He or she could not perform
any commercial driving.

evidence, objective medical records, and Simmons's report demonstrate that he "lacked the productivity, competence, and social skills to sustain employment." *See* Doc. 9, at 24. Griffith says that he is entitled to remand because the ALJ's hypothetical did not include social limitations and because "the mental demands of Plaintiff's past work are unclear." *See id*, at 24–25.

Griffith presents no evidence—testimonial, opinion, objective, or otherwise—to demonstrate that he has impairments that warrant these listed limitations. Instead, he presents hypothetical limitations which might have precluded him from work but which are not supported by the facts.

Griffith's protests notwithstanding, an ALJ "is only required to include in the [RFC] those limitations [that] he finds credible and supported by the record." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 170 (6th Cir. 2020) (citation omitted). Since mental limitations were not included in the RFC, they weren't required to be a part of the hypothetical—based on that RFC—that the ALJ posed to the vocational expert. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) ("It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact.") (citing *Hardaway*, 823 F.2d at 927–28).

The ALJ made reasonable findings after sufficient consideration of the full record, including objective medical evidence, medical opinion evidence, medical findings, vocational evidence, and Griffith's written and oral

testimony. *See, e.g.*, Tr. 16–17, 19, 22. The ALJ determined that Griffith had no severe mental impairments, so she did not include any limitations based on mental impairments in his RFC. *See* Tr. 22. Her hearing hypotheticals weren't required to include mental impairment limitations, and whether the mental demands of Griffith's past work were clear has no bearing on the fact that substantial evidence supports the finding that Griffith was capable of performing it. *See* Tr. 23.

In sum, the ALJ's decision, read as a whole adequately supports the findings and the RFC. *See Buckhanon*, 368 F. App'x at 678–79. Despite Griffith's assertions, the circumstances of his termination from Avita did not prove that he was unable to work. *See* Tr. 280–81. While Avita let Griffith go, Tr. 48–49, 255, even being "unemployable," if that were the case, would not be "equivalent to disabled." *Casey*, 987 F.2d at 1235 (citing *Odle v. Sec'y of Health & Hum. Servs.*, 788 F.2d 1158, 1161 (6th Cir. 1985)).

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: December 8, 2023

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

38

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019)